## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

PAOLA A. ZORRILLA,           )
                                       )
        **Plaintiff,**       )
                                       )      **No. 3:12-01188**
**v.**                               )      **Judge Nixon/Brown**
                                       )
**CAROLYN W. COLVIN,**   )
**ACTING COMMISSIONER**   )
**OF SOCIAL SECURITY,**    )
                                       )
        **Defendant.**    )

**To: The Honorable John T. Nixon, Senior United States District Judge**

## REPORT AND RECOMMENDATION

Plaintiff, proceeding *pro se*, brought this action under 42 U.S.C. §§ 405(g) and 1383(c) seeking judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i), 423(d). The undersigned **RECOMMENDS** that the Commissioner's decision be **AFFIRMED** for the reasons explained below.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB on July 14, 2009 alleging a disability onset date of January 12, 2007. (Doc. 8, p. 83) Plaintiff claimed that the following impairments prevented her from working: arthritis, asthma, depression, "dm," nerve damage, obstructive sleep apnea, total hysterectomy and oophorectomy,[1] overflow incontinence and vesicovaginal fistula,[2] major

---

[1] Oophorectomy – "the removal of an ovary or ovaries . . . ." *Dorland's Illustrated Medical Dictionary* 1323 (32nd ed. 2012).

[2] Vesicovaginal – "pertaining to or communicating with the urinary bladder and vagina." *Dorland's* at p. 2053. Fistula – "an abnormal passage or communication . . . leading from an organ to the surface of the body . . . ." *Dorland's*

depression,[3] panic attacks with agoraphobia,[4] fecal incontinence, type II diabetes mellitus,[5] autonomic neuropathy,[6] chronic left shoulder strain, tinnitus in both ears, lumbar spine degenerative arthritis, chronic right knee strain, cervical spine strain, and allergies. (Doc. 8, p. 229) Plaintiff's claims were denied initially on December 11, 2009 and upon reconsideration on February 19, 2010. (Doc. 8, pp. 85-86, 91-93)

Plaintiff requested a hearing before an Administrative Law Judge (ALJ) on March 1, 2010. (Doc. 8, p. 98) Plaintiff testified at the hearing held on June 9, 2010 before ALJ Brian Dougherty at which time counsel amended the disability onset date to May 15, 2009. (Doc. 8, pp. 39-91) Vocational expert (VE) Gary Sturgill testified at the hearing. (Doc. 8, pp. 73-77)

The ALJ entered an unfavorable decision on July 22, 2010. (Doc. 8, pp. 21-38) The Appeals Counsel denied plaintiff's request for review on October 22, 2012.[7] (Doc. 8, pp. 1-3)

Plaintiff filed this case in the district court on November 15, 2012. (Doc. 1) The Magistrate Judge entered a scheduling order on January 23, 2013 in which he instructed plaintiff to file a motion for judgment on the administrative record within 30 days of the date of entry of that order. (Doc. 9,

_____

at p. 711.

[3] The Magistrate Judge is unable to differentiate between "depression" listed as an impairment at p. 1, and "major depression" listed as an impairment above. Absent any explanation to the contrary, the Magistrate Judge construes "depression" and "major depression" to be one and the same.

[4] Agoraphobia – "intense, irrational fear of open spaces, characterized by marked fear of venturing out alone or being in public places where escape would be difficult or help might be unavailable. It may be associated with panic attacks . . . ." *Dorland's* at p. 40.

[5] Plaintiff lists "dm" at p. 1 and "type II diabetes mellitus"above as impairments that prevent her from working. The abbreviation "DM" stands for "diabetes mellitus . . . ." *Dorland's* at p. 2112. Absent any explanation to the contrary, the Magistrate Judge construes "dm" and "type II diabetes mellitus" to be one and the same.

[6] Autonomic neuropathy – "any neuropathy of the autonomic nervous system causing symptoms such as . . . disordered bowel, bladder, or sexual functions . . . . It is a complication of many diseases including . . . diabetes mellitus. . . ." *Dorland's* at p. 1268.

[7] The delay in the Counsel's decision appears to have been due to an administrative oversight by the SSA.

pp. 1-3)  Plaintiff subsequently filed a two-page letter dated February 5, 2013 that included sixty-six pages of attached documents described at n. 8 [8] below.  (Doc. 12)  Plaintiff did not file a motion for judgment on the administrative record as she was instructed.

On April 22, 2013, absent a motion for judgment on the administrative record, the Commissioner filed a response based on plaintiff's February 5, 2013 letter.  (Doc. 21)  The Commissioner raised the following two "implied" claims of error in her response: 1) whether substantial evidence supported the Commissioner's decision that plaintiff was not disabled; 2) whether the Commissioner applied the correct legal standards in making her decision.  The Commissioner refined these "implied" claims of error in terms of whether the ALJ erred at steps three and five of the five-step sequential process used by the SSA to determine whether a claimant is disabled.

Two-plus months later plaintiff sent the Magistrate Judge a one-page letter dated July 10, 2013 with a list of her medications.  (Doc. 22)  Thereafter, plaintiff sent a one-page letter to the Magistrate Judge dated August 19, 2013 "[r]equesting an immediate respon[se] to [her] claim." (Doc. 23)  Neither letter contained anything that could be construed as a motion for judgment on the administrative record or a reply to the Commissioner's response.

The Magistrate Judge entered an order on January 21, 2014 in an effort to provide plaintiff

---

[8]  Among the sixty-six pages of documents submitted by plaintiff is a copy of a letter from the Department of Veterans Affairs (VA) dated July 13, 2009 in which the VA notified plaintiff that her "service-connected disabilities are rated as 100 percent, permanently and totally disabling, effective 05-16-09." (Doc. 12, Ex. 3A)  Plaintiff submitted a copy of the VA's June 25, 2009 disability rating decision, a document that already was part of the administrative record. (Doc. 12, Ex. 4A)  Plaintiff also submitted copies of thirty-three pages of VA medical progress notes for the period May 26, 2010 through January 1, 2013.  (Doc. 12, Ex. 5A)  None of these records were before the SSA in the proceedings below.  Finally, plaintiff submitted a copy of a physical medical source statement completed by VA physician Dr. Pedro Salcedo, M.D. on November 12, 2012.  (Doc. 12, Ex. 6A)  On its face, Dr. Salcedo's medical source statement appears to support plaintiff's DIB claim.  However, the statement was not signed until more than two years after the ALJ entered his unfavorable decision, and nearly three months after the Appeals Counsel denied plaintiff's request for review.  Having never been presented to the SSA, Dr. Salcedo's statement is not properly before the court and, as such, will not be considered in this review.

another chance to argue her case.  (Doc. 28)  The Magistrate Judge instructed plaintiff to file a reply to the Commissioner's response not later than February 11, 2014.  The Magistrate Judge further instructed plaintiff to "respond to each of the Commissioner's arguments, providing appropriate citations to the record, statutes, regulations and case law in support of her reply."  Plaintiff was forewarned that failure to comply would result in the Magistrate Judge recommending disposition of the case based on the record before him.

Plaintiff sent a fourth letter to the Magistrate Judge dated January 23, 2014.  (Doc. 30) Plaintiff stated that she was not aware she had to reply to the Magistrate Judge's original order. Plaintiff then sent a fifth letter to the Magistrate Judge – inexplicably dated "January 7" – which was docketed February 11, 2014.  (Doc. 31)  Although submitted in a form of a reply, plaintiff's fifth letter failed to respond to each of the Commissioner's arguments as the Magistrate Judge instructed in his previous order.

This matter is now properly before the court.

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence of Record

The 2,400-plus page administrative record in this case contains more than 2,100 pages of medical records.  The vast majority of these pertain to plaintiff's prior service in the U.S. Army.  Due to their volume, plaintiff's military medical records will be addressed as necessary in the analysis, as will the VA's related June 25, 2009 Disability Rating Decision (the "VA's disability decision") and the VA treatment records subsequent to plaintiff's discharge from the  Army.  The medical records summarized below are those generated in connection with plaintiff's DIB claim.

Dr. Sankar Kumar, M.D., performed a physical residual functional capacity (RFC) assessment for asthma and diabetes in January 2009.  (Doc. 8, pp. 369-76)  Dr. Kumar determined that plaintiff could lift 50 pounds occasionally, 25 pounds frequently, *i.e.*, that she could perform

medium work as defined in 20 C.F.R. § 404.1567(c), that she could stand and/or walk with normal breaks about 6 hours in an 8-hour workday, that she could sit with normal breaks about 6 hours in an 8-hour workday, and that she had no push and/or pull restrictions, including the operation of hand and/or foot controls. (Doc. 8, p. 370) Dr. Kumar also determined that plaintiff could climb ramps, stairs, ladders, ropes and scaffolds occasionally, that she could balance, stoop, kneel, crouch, and/or crawl frequently, and that her only environmental restrictions were to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Doc. 8, pp. 371, 373)

Jennifer Fulmer, Ph.D., performed a mental RFC assessment in January 2009. (Doc. 8, pp. 351-68) Dr. Fulmer determined that plaintiff had experienced no episodes of decompensation for an extended duration, that she had moderate limitations in maintaining concentration, persistence or pace, and that she had mild limitations in activities of daily living and social functioning. (Doc. 8, p. 361) Dr. Fulmer determined further that plaintiff's limitations ranged from "not significantly limited" to "moderately limited" in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Doc. 8, pp. 365-66)

Dr. Nathaniel Robinson, M.D., performed a physical RFC assessment for diabetes mellitus, asthma, obesity, and arthritis of the right knee in October 2009. (Doc 8, pp. 2105-13) Dr. Robinson determined that plaintiff could lift 20 pounds occasionally, 10 pounds frequently, *i.e.*, light work as defined in 20 C.F.R. § 404.1567(b), that she could stand and/or walk with normal breaks about 6 hours in an 8-hour workday, that she could sit with normal breaks about 6 hours in an 8-hour workday, and that she had no push and/or pull restrictions, including the operation of hand and/or foot controls. (Doc. 8, p. 2106) Dr. Robinson also determined that plaintiff could climb ramps, stairs, ladders, ropes and scaffolds occasionally, that she could balance, stoop, kneel, crouch, and/or crawl frequently, and that her only environmental restrictions were to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Doc. 8, pp. 2107, 2109)

Dr. William O'Brien, Psy.D., performed a consultive psychological functional assessment of plaintiff in October 2009.  (Doc. 8, pp. 2114-18)  Dr. O'Brien diagnosed plaintiff with major depressive disorder, and moderate-to-severe panic disorder without agoraphobia.  (Doc. 8, p. 2117) Dr. O'Brien noted in his report that:

> [Plaintiff's] level of depression and anxiety-type symptoms appear to be causing moderate to significant disruptions in her ability to sustain concentration and persistence for prolonged periods of time, remembering complex instructions, maintaining schedules and attendance, tolerating mild to moderate levels of stress, socially interacting in an effective and efficient manner, as well as in meeting [the] daily task[s] of living on a consistent basis.  She is able to make plans independently of others, be aware of normal hazards and take precautions, remember and carry out simple instructions, maintain basic standards of neatness/cleanliness, and set realistic goals for herself.

(Doc. 8, p. 2117)

Dr. Larry Welch, Ed.D., conducted a mental RFC assessment in November 2009.  (Doc. pp. 2119-36)  Dr. Welch determined that plaintiff had experienced no episodes of decompensation for an extended duration, that she had moderate limitations in social functioning as well as maintaining concentration, persistence or pace, but that she had only mild limitations in activities of daily living.  (Doc. 8, p. 2129)  Dr. Welch determined further that plaintiff's limitations ranged from "not significantly limited" to "moderately limited" in understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  (Doc. 8, p. 2134)

Dr. Michael Ryan, M.D., completed a physical RFC assessment in November 2009 for degenerative osteoarthritis of the knees, degenerative osteoarthritis of the back, hypertension, asthma, etc.  (Doc. 8, pp. 2137-45)  Dr. Ryan's assessment of plaintiff's exertional limitations were the same as Dr. Robinson's, *i.e.*, that she could perform light work, except that Dr. Ryan opined that plaintiff's lower extremities limited her ability to push and/or pull.  (Doc. 8, p. 2138)  Dr. Ryan

determined that plaintiff could climb a ladder, rope, or scaffold occasionally, otherwise she had no postural limitations. (Doc. 8, p. 2139) Dr. Ryan determined that plaintiff's environmental restrictions were the same as those determined by Dr. Robinson. (Doc. 8, p. 2141)

Dr. Rebecca Joslin, Ed.D., completed a mental RFC assessment in December 2009. (Doc. 8, pp. 2146-63) Dr. Joslin determined that plaintiff had experienced no episodes of decompensation for an extended duration, but that she had moderate limitations in activities of daily living, social functioning, and maintaining concentration, persistence or pace. (Doc. 8, p. 2156) Dr. Joslin determined further that plaintiff's limitations ranged from "not significantly limited" to "moderately limited" in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Doc. 8, pp. 2160-61)

Dr. George Livingston, Ph.D., conducted a mental RFC assessment in February 2010. (Doc. 8, pp. 2270-87) Dr. Livingston determined that plaintiff had moderate limitations in activities of daily living, social functioning, and maintaining concentration, persistence and pace. (Doc. 8, p. 2280) Dr. Livingston had insufficient evidence to determine whether plaintiff had experienced any episodes of decompensation. However, he did conclude that plaintiff's limitations ranged from "not significantly limited" to "moderately limited" in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Doc. 8, pp. 2284-85)

On February 17, 2010, Dr. William Downey, M.D., affirmed Dr. Ryan's November 2009 physical RFC assessment as written. (Doc. 8, p. 2288)

### B. The Hearing Before the ALJ

As previously noted, the hearing was held before ALJ Dougherty on June 9, 2010. (Doc. 8, pp. 39-81) Counsel for plaintiff advised the ALJ at the hearing that the doctors at the VA had "refused" to complete medical source statements, the upshot of which was that plaintiff had no medical source statements to submit. (Doc. 8, p. 42)

Upon questioning by the ALJ, plaintiff testified that she was medically retired from the Army on May 15, 2009, that she had been a "signal communicator," but had not worked in her military occupational specialty for "a long time," having worked in administrative offices, the mail room, and processing soldiers after she became "non-deployable." (Doc. 8, pp. 45-46) Plaintiff testified that she went before the Army's Medical Evaluation Board/Physical Evaluation Board (MEB/PEB) three times before finally being discharged. (Doc. 8, p. 46)

Plaintiff testified about her physical and mental impairments at the hearing. That testimony is addressed point by point in the analysis below at pp. 20-40. When the ALJ asked plaintiff whom she considered to be her treating physician(s), plaintiff answered that she had begun seeing "Dr. Sisedo [phonetic] a month ago," but it was apparent from her testimony that she did not have a doctor whom she saw on a regular basis at the time of the hearing.[9] (Doc. 8, p. 58)

When asked about her physical impairments, plaintiff testified that she could sit and stand for only 10 minutes without a break. (Doc. 8, pp. 62-63) Plaintiff testified that she could shop at the grocery store, but got "dizzy" when she did, and that either her husband or her aunt had to drive her to the store. (Doc. 8, p. 63) When asked how long she could walk, plaintiff answered "between 10, 15 minutes at the most." (Doc. 8, p. 64) When asked if she could "lift things around the house," plaintiff replied, "[n]ot any more," although she admitted that she could lift a gallon of milk (approximately 6 lbs.) a "couple of times" with her left hand, but could not lift a gallon of milk with her right hand because she "ha[d] no sensation in it . . . ." (Doc. 8, p. 64) Plaintiff admitted that she could write her name and use a computer keyboard. (Doc. 8, pp. 64-65)

On questioning by her attorney, plaintiff testified that she took 14 medications daily, that 7

_____

[9] The record shows that plaintiff first saw Dr. Salcedo "to get established" on May 26, 2012, fourteen days prior to the hearing, and that she did not see him again until June 12, 2012, three days after the hearing. (Doc. 12, Ex. 5A, pp. 1 & 3 of 33)

of them made her feel "[d]izzy, depressed, tired, sleepy," and that her medications required that she take up to five naps a day, two of which were "long nap[s]." (Doc. 8, p. 66) Plaintiff told the ALJ that she took her first long nap from just prior to noon until 3:00 p.m., the second long nap in the evening, and the shorter naps when she got sleepy watching television. (Doc. 8, pp. 66-67) Plaintiff also testified that her husband had to keep their checkbook and schedule for her medications, and that he actually had to help her take her medications because she fell asleep. (Doc. 8, p. 67)

Counsel asked plaintiff about abdominal pains, pointing out to the ALJ that plaintiff was "leaning on the table." (Doc. 8, p. 68) Plaintiff replied that she had "a lot of pain" from her "neck all the way down . . . the whole support of [her] body," and that the pain required her to lie down, and "when [she got] up . . . [she would have to ] . . . go and cry and lay down [on the] bed." (Doc. 8, p. 68) Plaintiff testified further that she had to use her left arm "to support [her] upper body," that she could not sit because of the pain, that she could not use both of her hands, that she became short of breath just going to the bathroom, and that she could wash only a few cups at a time because she could not support herself at the sink and her knees would "go out . . . all the time." (Doc. 8, p. 69) Plaintiff testified that she did not drive because the medications that she took, but that she had panic attacks and became scared when she rode in a vehicle with someone else driving. (Doc. 8, p. 70)

The ALJ presented the VE with the following hypotheticals after determining that plaintiff's Army experience did not constitute a transferrable skill:

> I want you to consider an individual who is . . . between 37 and 39 years old. A 12th grade education, three years of college . . . is fluent and able to communicate in English and in Spanish, has past relevant work in the heavy skilled area as you described. First hypothetical, consider that the individual can occasionally lift 20 pounds, frequently lift 10 pounds, can sit . . . stand and walk up to six hours per day. From a postural standpoint, can . . . have no ladders and [can only] occasionally engage in stairs, balance, and stoop[], kneel[], crouch[], and crawl[]. Should . . . avoid concentrated exposure . . . to fumes, gases, smoke and other inhalants. . . . [F]rom a mental standpoint, consider that the individual can perform one to three step tasks with normal

> supervision. Should work in . . . small group work settings and is . . . more adapted to working with objects than with people. . . . [A]ny interaction with the public should be casual and superficial. Can have frequent interaction with coworkers and supervisors, and she can adapt . . . to change. . . .

(Doc. 8, pp. 73-74) The VE testified that the hypothetical person would not be able to perform any past relevant work. When the ALJ asked the VE if there were any other jobs in the regional or national economy that the hypothetical person could perform, the VE testified that "light work" was available as an unarmed security guard, courier, or personal care attendant. (Doc. 8, p. 75)

The ALJ presented the VE with the following second hypothetical:

> From a physical standpoint, consider that the individual can . . . occasionally lift 10 pounds with her left arm. But can . . . only occasionally lift three to five pounds with her right arm. Has . . . same with the right arm, only occasional . . . handling. No limitations with the left arm and hand, no real limitations with fine motor skills on either hand. Can . . . stand for . . . intervals of 15 minutes. Can sit in intervals of 15 minutes. So we'd need a sit stand option every 15 minutes . . . walking would be limited to within a range work area of 50 feet. No ladders, occasional stairs, balance, stoop, kneel, crouch, crawl . . . avoid concentrated exposures to fumes and gases. . . .

(Doc. 8, pp. 75-76) The VE testified that this person would not be able to perform any past relevant work, and that there was no other work that she could perform. (Doc. 8, p. 76)

### C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process described below to determine whether an individual is "disabled" within the meaning of the Act.

> First, the claimant must demonstrate that she has not engaged in substantial gainful activity during the period of disability.

Second, the claimant must show that she suffers from a severe medically determinable physical or mental impairment.

Third, if the claimant shows that her impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then she is deemed disabled.

Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform her past relevant work, in which case the claimant is not disabled.

Fifth, the ALJ determines whether, based on the claimant's RFC, as well as her age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)(internal citations omitted); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). The claimant bears the burden of proof at steps one through four. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). The burden then shifts to the Commissioner at step five "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

The SSA's burden at the fifth step may be met by relying on the medical-vocational guidelines, known in the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics in the applicable grid rule. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity to work, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253 at *4 (SSA)). In determining the RFC for purpose of the analysis at steps four and five, the SSA is required to

consider the combined ef+fect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *see Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

A review of the record shows that the ALJ complied with the required five-step process. However, as previously explained at p. 3, the claims of error before the court are that the ALJ erred at steps three and five.

## III. ANALYSIS

### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the findings of fact are supported by substantial evidence on the record, and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Key v. Callahan* 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). In other words, if the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. 42 U.S.C. §§ 405(g), 1383(c); *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *see also Key*, 109 F.3d at 273.

### 1. Military Service Disability Versus Disability Under the Act

The Magistrate Judge notes as an initial matter that plaintiff appears to be under the impression that, just because she was declared 100 percent disabled by the VA for the purpose of

military service, she is *ipso facto* entitled to DIB. The Magistrate Judge will address this point before turning to the two claims of error at issue.

The Sixth Circuit has not set forth a specific standard regarding the weight the Commissioner should afford a 100 percent disability determination by the VA. *See LiRiccia v. Comm'r of Soc. Sec.*, __ Fed.Appx. __ at * 9, 2013 WL 6570777 (6ᵗʰ Cir. 2013)(citing *Stewart v. Heckler*, 730 F.2d 1065 (6ᵗʰ Cir.1984)). SSA regulations provide only that "a determination made by another agency that [a claimant is] disabled . . . is not binding on [the Commissioner]." *LiRiccia*, 2013 WL at * 9 (citing 20 C.F.R. § 404.1504). The Commissioner may, however, find another agency's determination relevant, depending on the similarities between the rules and standards each agency applies to assess disability. *LiRiccia*, 2013 WL at * 9 (citing SSR 06–03p, 2006 WL 2329939 at *7 (August 9, 2006)("[B]ecause other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency.")). An ALJ "should," nevertheless, "explain the consideration given to these decisions in his notice of decision." *LiRiccia*, 2013 at * 9 (citing SSR 06-03p).

The ALJ noted in his decision that the Commissioner was not bound by the VA's disability determination, explaining that the "standards and criteria for determining disability for VA benefits of [a] service member are significantly different than those necessary for a civilian to establish disability for Social Security benefits . . . ." (Doc. 8, p. 31) The ALJ's statement captures the essence of the fact that, while one might be disabled with respect to the often rigorous demands of military service, including combat or combat support, those same impairments do not necessarily render one disabled in context of employment in the civilian sector. The ALJ also correctly noted that "the VA . . . declined to complete paperwork which the claimant requested in connection with her application for benefits." (Doc. 8, pp. 31-32)

The ALJ explained the consideration that he gave to the VA's disability decision. That is all

that he was required to do.  Therefore, any argument that plaintiff might make that the ALJ erred by not granting her DIB claim based on the VA's disability determination is without merit.

### 2.  The First Claim of Error: Whether the ALJ Erred at Step Three

The first claim of error before the court is that the ALJ erred at step three when he determined that plaintiff was <u>not</u> disabled under one of the listed impairments in the regulations.  The ALJ determined at step three that plaintiff had the following severe impairments: obesity, diabetes, incontinence, chronic back and knee pain, depression, and panic disorder.  (Doc. 8, 26)   The Commissioner argues that the ALJ did not err, and that substantial medical evidence on the record supports the ALJ's determination at step three.  (Doc. 21, pp. 11-13)

A claimant will be found disabled at step three if her impairments meet or equal one of the physical or mental listings in the published Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 655 (6th Cir. 2009). The listing of impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments that the SSA considers "severe enough to prevent an individual from doing any gainful activity, regardless of her age, education, or work experience." *Rabers*, 582 F.3d at 653 (citing 20 C.F.R. § 404.1525(a)).  A claimant who meets the requirements of a listed impairment is deemed conclusively disabled.  *Rabbers*, 582 F.3d at 653.

The ALJ's treatment of the foregoing procedural requirements at the step three is quoted below in relevant part:

> No treating or examining physician has suggested the presence of any impairment or combination of impairments of listing severity. **The undersigned has considered listings relative to the above impairments, but does not find the presence of any criteria set forth in said listings to warrant a finding that the claimant meets or equals any listing**.

> The claimant's mental impairments, considered singly and in combination,

do not meet or medically equal the criteria of listings 12.02 and 12.04. In making this finding, the undersigned has considered whether the 'paragraph B' criteria are satisfied. To satisfy the 'paragraph B' criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living the claimant has moderate restriction. Any restriction in this area is due to physical limitations. In social functioning, the claimant has moderate difficulties. She goes to church and alleges no problem getting along with others. With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant has some memory deficits which would impact this area. As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been for an extended duration.

Because the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episode of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied. The undersigned has also considered whether the 'paragraph C' criteria are satisfied. In this case, the evidence fails to establish the presence of the 'paragraph C' criteria.

(Doc. 8, pp. 26-27)(emphasis added)

### a. Consideration of Plaintiff's Physical Impairments at Step Three

20 C.F.R. § 404.1520 describes generally the five-step sequential process for evaluating physical and mental disabilities. 20 C.F.R. § 404.1520(a)(iii) describes the process at step three of that process. 20 C.F.R. § 404.1520a describes a "special technique" for evaluating mental impairments under § 404.1520. There is no equivalent "special technique" in the regulations for evaluating a claimant's physical impairments.

It is apparent from the excerpt of the ALJ's decision quoted in bold at p. 14 that the ALJ

considered <u>all</u> of plaintiff's severe physical impairments listed at step two. (Doc. 8, ¶¶ 3-4, p. 26) It also is apparent from the excerpt that the ALJ did not address plaintiff's physical impairments beyond noting that he considered them and that none met or equaled any listing.

"The ALJ did not err by not spelling out every consideration that went into the step three determination" as it pertained to plaintiff's physical impairments. *See Bledsoe v. Barnhart, Comm'r of Soc. Sec.*, 165 Fed.Appx. 408, 411, 2006 WL 229795 at * 3 (6th Cir. Ohio))(mixed claims involving physical and mental impairments). The regulations do not require the ALJ to "articulate, at length, the analysis of the medical equivalency issue," only that he "review all evidence of impairments to see if the sum of impairments is medically equivalent to a 'listed impairment.'" *Bledsoe*, 165 Fed.Appx at 411. The ALJ said that he considered all of the evidence pertaining to plaintiff's physical impairments, and that is all that the ALJ was required to do under the regulations.

Because the ALJ satisfied the analysis requirements with respect to plaintiff's physical impairments under 20 C.F.R. § 404.1520, and because that analysis is supported by substantial evidence as discussed below at ¶¶ III.A.3.a(1)-(2), (4)-(11), pp. 20-22, 26-40, the first part of the first claim of error is without merit.[10]

### b. Consideration of Plaintiff's Mental Impairments at Step Three

As previously noted at p. 15, there is a "special technique" that the ALJ is required to follow

---

[10] Even assuming for the sake discussion that it were deemed on subsequent review that SSA regulations were interpreted to require the ALJ to address each of plaintiff's physical impairments in detail, the law in the 6th Circuit is well established that, "if an agency . . . fail[s] to adhere to its own procedures, [the courts] will not remand for further administrative proceedings unless that claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)). In other words, any alleged deviation from SSA regulations attributable to the ALJ's analysis at step three is subject to harmless error analysis. As shown in the analysis at ¶¶ III.A.3.a(1)-(2), (4)-(11), pp. 20-22, 26-40, the objective medical evidence of record does not support a finding of disability based on plaintiff's physical impairments. Therefore, by definition, plaintiff's physical impairments would not/could not have satisfied any of the listed impairments and, as such, any error on the ALJ's part for not addressing them in detail in his step three analysis is harmless.

when evaluating a claimant's mental impairments. This "special technique" requires the ALJ to "determine whether the claimant's impairment 'meets or is equivalent in severity to a listed mental disorder'" in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Rabbers*, 582 F.3d at 654. The regulation specifies that the "level of severity for the[] disorders [listed] is met when the requirements of both [paragraphs] A and B are satisfied, or when the requirements in [paragraph] C are satisfied." 20 C.F.R Part 404, Subpt. P, App. 1 §§ 12.02 and 12.04. "[A] claimant who meets the requirements of a listed impairment" under 20 C.F.R. Pt. 404, Subpt. P, App. 1 is "deemed conclusively disabled." *Rabbers*, 582 F.3d at 654.

The "regulations require only that the ALJ's written decision . . . 'incorporate the pertinent findings and conclusions based on the technique.'" *Rabbers*, 582 F.3d at 653-54 (quoting 20 C.F.R. § 404.1520a(e)(2)). The decision must "refer to the significant history . . . considered," and "include a specific finding as to the degree of limitation in each of the functional areas." *Rabbers*, 582 F.3d at 654 (citing 20 C.F.R. § 404.1520a(e)(4). The ALJ's decision also must "record the presence or absence of the criteria [of the listing] and the rating of the degree of functional limitation." *Rabbers*, 582 F.3d at 654 (quoting § 404.1520a(d)(2)).

A plain reading of the excerpt from the ALJ's analysis quoted at pp. 14-15 shows that the ALJ complied with each of the requirements set forth above and, as discussed below at ¶ III.A.3.a(3), pp. 22-26, his analysis is supported by substantial evidence. Accordingly, the second part of the first claim of error is without merit as well.

### 3. Second Claim of Error: Whether the ALJ Erred at Step Five

The second claim of error is that the ALJ erred at the fifth step in the sequential process, *i.e.*, in his determination that plaintiff was not disabled based on her RFC, age, education, work experience. In arguing that the ALJ did not err, the Commissioner maintains that the ALJ applied

the RFC determined at step four correctly at step five, that he properly considered plaintiff's subjective complaints and credibility, that he gave due consideration to opinion evidence, and that his determination that plaintiff was capable of performing the full range of light work was supported by substantial evidence.  (Doc. 21, ¶¶ C-D, pp. 13-21)

Step five in the sequential process depends in major part on the ALJ's RFC determination at step four.  If the ALJ's RFC determination at step four is flawed, then his analysis at step five will be flawed as well.  Therefore, the Magistrate Judge will address the ALJ's RFC determination at step four before addressing his determination at step five.

### a. Step Four Analysis

In the fourth step, the ALJ evaluates a claimant's RFC which is defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ determined that plaintiff had the RFC to do the following:

> [L]ift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk 6 hours and sit 6 hours in an 8 hour workday; cannot climb ladders; only occasionally climb stairs, balance, stoop, kneel, crouch or crawl; should avoid concentrated exposure to fumes, gasses and inhalants; can perform 1-3 step tasks with normal supervision; should be in small group work settings; would do better working with objects rather than people; can adapt to change; and can set reasonable goals.

(Doc. 8, p. 27)  The RFC above means that plaintiff is capable of performing the full range of light work as defined in 20 C.F.R. § 404.1567(b), subject to the exertional, postural, and environmental limitations indicated.  In formulating the RFC, the ALJ is required to evaluate all relevant medical and other evidence, and consider what weight to give to that evidence.  20 C.F.R. § 404.1545(a)(3). By regulation, the ALJ's RFC determination must be supported by substantial evidence.

The Magistrate Judge notes the following prior to addressing whether substantial evidence supports the RFC determination quoted above.  First, as previously noted, plaintiff failed to respond

to the Commissioner's arguments, including the Commissioner's argument that the ALJ's decision at step four is supported by substantial evidence. Therefore, the Magistrate Judge liberally construes plaintiff to argue in her reply that the ALJ's RFC analysis was not supported by substantial evidence.

Second, as previously noted at p. 3 n. 3 and p. 7, there were no statements from any treating source before the SSA at the time of the proceedings below. Therefore, the treating physician rule does no apply to the ALJ's RFC determination.[11]

Finally, the impairments on which plaintiff bases her DIB claim is a moving target. The list grows with each new filing to add impairments not raised previously. That said, plaintiff enumerated several specific impairments in her reply. (Doc. 31, pp. 3-4) Those are the only impairments before the court in this review. Of these impairments, however, those listed at n. 12[12] below were not raised prior to bringing this action. Because these impairments were not raised in the proceedings below, they are not properly before this court and will not be considered. Additionally, the impairments listed at n. 13[13] below are not supported by any factual allegations. Because plaintiff's arguments with respect to those impairments are conclusory, the Magistrate Judge will not consider them either. The remainder of the impairments addressed subparagraphs (1) through (11) below were raised in the proceedings below and, as such, are properly subject to review by this court. The evidence

---

[11] Plaintiff argues that the ALJ did not "have all relevant evidence of record." (Doc. 31, p. 5) More particularly, plaintiff asserts that there are eight volumes of medical records dating back to 1991 that were not considered. (Doc. 31, p. 5) Plaintiff did not provide those records during the proceedings below, nor has she provided those records to this date. Plaintiff also argues that the ALJ made no mention of VA medical assessments or those by Dr. Salcedo. (Doc. 31, p. 5) The record shows that the ALJ did, in fact, address the VA medical records but, as previously established at p. 3, n. 8, Dr. Salcedo's assessments were not presented in the proceedings below. The ALJ gave counsel the opportunity to file a "post hearing brief" which counsel did. (Doc. 8, pp. 79, 292-96) However, the records to which plaintiff refers were not provided with the post-hearing brief.

[12] "Intervertebral Disc Syndrome of L/R Hips," "Tonsillectomy," "Superficial Varicosities," "hypertension," "Lower Abdomen Scars," and "Breast Residual." (Doc. 31, p. 4)

[13] "Musculoskeletal," "Allergies," "other[] dysfunctional conditions not listed because they are consequences of the Diabetes, Sleep apnea and Overflow incontinence and Vesicovaginal fistula, Allergies, Depression and Circulation Problems." (Doc. 31, p. 4)

addressed in (1) through (11) below is presented in the following order: 1) plaintiff's military medical records; 2) the VA's disability decision; 3) VA medical records subsequent to plaintiff's discharge; 4) medical reports generated while plaintiff's DIB claim was pending in the SSA; 5) plaintiff's testimony at the hearing.

### (1) Incontinence

Plaintiff's military medical records reflect urinary incontinence as a medical condition for many years. However, those same medical records show that plaintiff reported only "occasional urinary incontinence" as recently as November 2008, and "[n]o urinary incontinence" in February 2009. (Doc. 8, pp. 403, 414) Plaintiff's military medical records show that she never was diagnosed or treated for fecal incontinence. Indeed, plaintiff reported in February 2009 that she had "CHRONIC CONSTIPATION WITH BOWEL MOVEMENTS EVERY 3 DAYS." (Doc. 8, p. 402)

The VA awarded plaintiff 40 percent disability for overflow incontinence and vesicovaginal fistula. (Doc. 8, p. 200) The VA explained that "[a]n evaluation of 40 percent is granted for the required wearing of absorbent materials which must be changed two to four times per day . . . [and] . . . whenever there is a voiding interval of less than one hour . . . ." (Doc. 8, p. 200)

The VA awarded plaintiff 30 percent disability for "fecal incontinence secondary to diabetes mellitus . . . ." (Doc. 8, p. 202) The VA explained that "30 percent [wa]s granted for occasional involuntary bowel movements which require wearing a pad." (Doc. 8, p. 202)

There are numerous references to plaintiff's urinary incontinence in the VA medal records subsequent to her discharge from the Army. All are based on plaintiff's subjective complaints. None is based on objective medical evidence. As to fecal incontinence, plaintiff denied having "bowel incontinence" to the VA in 2010. (Doc. 8, 2290, 2295)

As previously noted at pp. 4-7, Drs. Kumar, Robinson, and Ryan conducted physical RFC assessments on January 22, October 1 and November 25, 2009 respectively. All three doctors

considered plaintiff's incontinence in their assessments that plaintiff was capable of performing light to medium work. (Doc. 8, pp. 376, 2112, 2144)

Plaintiff testified at the hearing that she experienced urinary incontinence "up to two times a night." (Doc. 8, p. 49) She also testified that she experienced urinary incontinence "during the day," apparently with the same approximate frequency, and that she could "have an accident" if "not close to the bathroom." (Doc. 8, p. 49) Plaintiff testified further that she suffered fecal incontinence, but medication had resolved that issue, and she now could "control [her bowels] to the bathroom." (Doc. 8, p. 50)

Although the ALJ determined that incontinence constituted a severe impairment, as shown above, substantial evidence on the record supports the conclusion that incontinence did not preclude plaintiff from performing light work.

### (2) Obstructive Sleep Apnea

Plaintiff's military medical records show that she reported "no sleep disturbances" between July 2006 and April 2008. (Doc. 8, pp. 499, 508, 513, 528, 537, 690, 830, 832, 1058, 1087) However, for reasons not apparent in the medical records, a sleep study was performed in January 2008, following which plaintiff began using a CPAP machine in October 2008. (Doc. 8, pp. 425, 505) Plaintiff's military medical record for November 25, 2008 reported that plaintiff's "[s]leep [w]as now good . . . on [the] CPAP machine." (Doc. 8, p. 415)

The VA awarded plaintiff 50 percent disability for obstructive sleep apnea. (Doc. 8, p. 199) The VA noted, however, that plaintiff took "a polysomnogram[14] on January 25, 2008 . . . [with] . . . a resulting impression of borderline mild sleep apnea-hypopnea syndrome." (Doc. 8, p. 199) The

---

[14] Polysomnogram – "the polygraphic recording during sleep of multiple physiologic variables, both directly and indirectly related to the state and stages of sleep, to assess biological causes of sleep disorders." *Dorland's* at p. 1494.

"50 percent evaluation [was] based on [plaintiff's] requirement for CPAP." (Doc. 8, p. 199) There are only occasional references to plaintiff's sleep apnea in the VA medal records subsequent to her discharge from the Army, all of which are historical in nature.

Drs. Kumar, Robinson, and Ryan considered plaintiff's sleep apnea in their assessments that plaintiff was capable of performing light to medium work. (Doc. 8, pp. 376, 2112, 2144)

Plaintiff testified at the hearing that her CPAP machine helped her sleep apnea "a lot," but that taking the CPAP machine off and putting it back on when she had to go to the bathroom in the middle of the night caused her to be "sleepy and tired." (Doc. 8, pp. 47-48)

As shown above, substantial evidence on the record supports the conclusion that sleep apnea did not preclude plaintiff from performing light work.

### (3) Depression and Panic Attacks

### (a) Depression

Plaintiff's military medical records show that she consistently reported not being depressed from August 2005 through April 2008. (Doc. 8, pp. 305, 313, 315, 499, 508, 513, 528, 537, 746, 784, 789, 806, 815, 838, 844, 847, 852, 862, 868, 871, 874, 876, 879, 1058, 1378, 1395, 1966) In November 2007, however, plaintiff was assessed as depressed ("scored near threshold on depression scale"), but her "[m]ental status was normal." (Doc. 8, p. 628) A year later, in November 2008, plaintiff reported being depressed because of "difficulty handling her medical problems." (Doc. 8, p. 414) In February 2009 plaintiff screened positive for depression, claiming that she was depressed "ONLY DUE TO CHRONIC PAIN." (Doc. 8, p. 404) In March 2009, plaintiff again screened positive for depression. (Doc. 8, p. 386)

The VA awarded 30 percent disability for "major depression without psychotic features and panic attacks with agoraphobia . . . ." The VA explained that:

> 30 percent is granted whenever there is occupational and social impairment

> with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks . . . due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic impairment, mild memory loss . . . such as forgetting names, directions, recent events . . . .

(Doc. 8, p. 201)

There are few references to depression in the VA medical records subsequent to plaintiff's discharge from the Army, and of those only one is relevant. In July 2009, the VA reported that plaintiff's score of "2" in the Army's PHQ-2 screening for depression in December 2008 was "a negative screen," and that her July 2009 screening for depression by the VA was negative as well. (Doc. 8, p. 2262)

As previously noted at pp. 5-7, Drs. Fulmer, Welch, Joslin, and Livingston completed mental RFC assessments on January 22, November 24, and December 4, 2009, and February 16, 2010 respectively ("the four mental RFC assessments"). All four doctors took plaintiff's depression into account in their assessments that plaintiff suffered, at most, only "moderate" related limitations. (Doc. 8, pp. 363, 2131, 2158, 2282)

As previously noted at p. 6, Dr. O'Brien performed a consultive psychological functional assessment of plaintiff in October 2009. He diagnosed plaintiff with a major depressive disorder, and opined that plaintiff's "level of depression and anxiety-type symptoms" appeared to cause moderate to severe restrictions in her functional limitations. (Doc. 8, p. 2117) Dr. O'Brien wrote in his report that his assessment was based on his clinical interview with plaintiff and a mental status examination. (Doc. 8, p. 2114) Plaintiff's medical and psychiatric records were "unavailable." (Doc. 8, p. 2114) Dr. O'Brien rested the reliability of his report on having not observed any "significant evidence of malingering, exaggeration, inconsistency, or lack of effort . . . ." (Doc. 8, p. 2114)

23

As a general matter, an opinion from a medical source who has examined a claimant, such as Dr. O'Brien, is given more weight than an opinion from a source who has not performed an examination, such as Drs. Fulmer, Welch, Joslin, and Livingston. *Gayheart*, 710 F.3d at 375 (citing 20 C.F.R §§ 404.1502 and 404.1527(c)(2)). In other words, all things considered equal, Dr. O'Brien's assessment should be entitled to somewhat greater weight than the assessments of Drs. Fulmer, Welch, Joslin, and Livingston. However, Dr. O'Brien's report reveals that his impressions pertaining to plaintiff's depression were based solely on her subjective representations to him. Dr. O'Brien also did not review plaintiff's records because they were not available, and the only test that he administered was the WAIS-III Digit Span Sub-test, from which he concluded that plaintiff's "[e]stimated intellectual functioning [wa]s within the average range." (Doc. 8, p. 2116)

As shown above, there is nothing in Dr. O'Brien's assessment to suggest that his depression-related impressions are based on any objective medical evidence, whereas the reports of Drs. Fulmer, Welch, Joslin, and Livingston reflect that they considered the objective medical evidence of record in making their assessments. Additionally, Dr. O'Brien's impression that plaintiff suffered from a major depressive disorder is out of synch with the VA's December 2008 and July 2009 depression screenings. The July 2009 result, recorded just 3 months prior to Dr. O'Brien's assessment, shows that plaintiff screened "negative" for depression. For these reasons, Dr. O'Brien's opinion does not trump the opinions of Drs. Fulmer, Welch, Joslin, and Livingston, despite the fact that he actually examined her.

Plaintiff testified at the hearing that depression caused her to forget even "simple stuff," prevented her from focusing, and caused her not to know what was going on. (Doc. 8, p. 59)

Although the ALJ determined that depression constituted a severe impairment, as shown above, substantial evidence on the record supports the conclusion that depression did not preclude plaintiff from performing light work.

### (b) Panic Attacks

Plaintiff's military medical records show that she was treated for panic disorder without agoraphobia on October 11 and 19, 2007. (Doc. 8, pp. 677, 694) Although plaintiff's military medical records carry that condition forward thereafter, plaintiff presented for treatment for panic attacks on only those two occasions.

The VA considered plaintiff's panic attacks in the context of her depression claim, noting that plaintiff's "psychiatric symptoms cause[d] occupational and social impairment with occasional decrease in work efficiency and intermittent inability to perform occupational tasks although . . . your are functioning satisfactorily . . . ." (Doc. 8, p. 201) There are no references to panic attacks in the VA medical records following plaintiff's discharge from the Army.

Drs. Fulmer, Welch, Joslin, and Livingston took plaintiff's panic attacks into consideration in their assessments that plaintiff suffered, at most, only "moderate" related limitations. (Doc. 8, pp. 363, 2131, 2158, 2282)

Dr. O'Brien's October 13, 2009 clinical impression was that plaintiff had moderate to severe panic disorder without agoraphobia that "appear[ed] to be causing moderate to significant disruptions in her ability to sustain concentration and persistence for prolonged periods of time, remembering complex instructions, maintaining schedules and attendance, tolerating mild to moderate levels of stress, socially interacting in an effective and efficient manner, as well as in meeting daily task of living on a consistent basis." (Doc. 8, p 2117) The weight of Dr. O'Brien's opinion is limited for the reasons explained at pp. 23-24.

Plaintiff testified at the hearing that she had panic attacks "[a]ll the time . . . when . . riding [in] a vehicle with somebody . . . ." (Doc. 8, p. 70)

Although the ALJ determined that panic attacks constituted a severe impairment, as shown above, substantial evidence on the record supports the conclusion that panic attacks did not preclude

plaintiff from performing light work.

### (4) Type II Diabetes Mellitus

Plaintiff's military medical records show that she was diagnosed with diabetes mellitus in September 2007. (Doc. 8, p. 734) Although that diagnosis was carried forward as a condition in the medical records in the years that followed, plaintiff's military medical records show that she responded well to treatment. In March 2008, it was reported that plaintiff "ha[d] made significant lifestyle changes and [blood sugar] within goal now – A1c down from 11.0% to 7.9% in one month . . . ." (Doc. 8, p. 1070) In October 2008 it was reported that "SSG Zorrilla's type 2 diabetes mellitus is well controlled on her current regimen." (Doc. 8, p. 1626) In November 2008, it was reported that plaintiff's "blood glucose trends have been well controlled (AM fasting sugars 70-90s, 2hr post-prandial 120-130s), and her High A1Cs have been in the 5.5-5.8 range consistently. . . . Her diabetes is well-controlled and she is asymptomatic presently." (Doc. 8, p. 413)

The VA awarded 20 percent disability for "type II diabetes mellitus with lower extremity neuralgia and autonomic neuropathy . . . ." (Doc. 8, p. 202) Although the VA examiner noted neuropathy in plaintiff's lower extremities, he also wrote that plaintiff's "sensory function [was] within normal limits." (Doc. 8, p. 202) The VA examiner also determined that plaintiff had "autonomic neuropathy of [the] abdomen," but the condition was "not shown to cause any functional impairment . . . ." The 20 percent award was granted solely on the basis that plaintiff required "insulin and restricted diet, or oral hypoglycemic agent and restricted diet." (Doc. 8, p. 203)

The VA medical records reveal the following subsequent to plaintiff's discharge from the Army. In January 2010, plaintiff presented with her diabetes out of control because she was not adhering to her diabetic regimen. (Doc. 8, pp. 2318-20) In February 2010, plaintiff reported feeling "much better" on her "current regimen," and expressed concern only that she was "gain[ing] a bit of weight." (Doc. 8, p. 2311) In April 2010, plaintiff reported "she is 'doing so much better' . . .

her MBG has been 110 with no episodes of hypoglycemia . . . [she] [c]ontinues Lantus and is happy with this method." (Doc. 8 p. 2302-03)

Drs. Kumar, Robinson, and Ryan considered plaintiff's diabetes in their assessments that plaintiff was capable of performing light to medium work. (Doc. 8, pp. 376, 2112, 2144)

Plaintiff testified at the hearing that she was diagnosed with diabetes in 2007, that "the diabetes was very high . . . [and] . . . not controlled," that it caused "numbness" in her arms, and made her dizzy, scared, nervous, sad, and depressed. (Doc. 8, pp. 47, 49-50) Plaintiff testified that swallowing hurt because of the diabetes, and that she had a "rash" on her back that she attributed to the her daily insulin shot. (Doc. 8, pp. 50-51) Plaintiff testified on the other hand that the insulin was working, and that it had cut her sugar level by more than half. (Doc. 8, p. 51)

Although the ALJ determined that diabetes constituted a severe impairment, as shown above, substantial evidence on the record supports the conclusion that diabetes did not preclude plaintiff from performing light work.

### (5) Total Hysterectomy and Oophorectomy

Plaintiff's military medical records show that she had a total hysterectomy and oophorectomy in 2003. (Doc. 8, p. 2344) The military medical records show that she presented for abdominal pain repeatedly in the years that followed. (Doc. 8, pp. 299, 301, 303, 305, 310, 312, 314, 317, 385, 397, 402, 424, 436, 470, 484, 657, 684, 718, 783, 798, 816, 838, 871, 942, 1312) However, a CT scan in July 2004 was unremarkable (Doc. 8, pp. 1431-32), and another in February 2009 revealed "NO ACUTE FINDINGS" (Doc. 8, p. 1412).

The VA awarded 50 percent disability for these in-service surgeries "for complete loss of the uterus and both ovaries following a period of postsurgical convalescence." (Doc. 8, p. 199) The VA also awarded special compensation for the "loss of use of a creative organ . . . ." (Doc. 8, p. 216) The VA declined to award any disability for the surgical scars because the scars were "not

considered disabling because of limitation of function . . . ." (Doc. 8, p. 219) Finally, the VA declined to award disability for the nerve block used in the surgeries at issue "because the medical evidence of record fail[ed] to show that a disability has been clinically diagnosed" for "neuropathy and circulation problems to [the] nerve block . . . ." (Doc. 8, p. 221)

The VA performed a CT scan of plaintiff's abdomen and pelvis in August 2009 after her discharge from the Army. (Doc. 8, p. 2179) The CT revealed that plaintiff had previously had a hysterectomy and bilateral oophorectomy, but the scan was an "otherwise negative exam." (Doc. 8, p. 2179) In June 2010, plaintiff denied abdominal pain altogether. (Doc. 8, p. 2290)

Drs. Kumar, Robinson, and Ryan considered plaintiff's hysterectomy and oophorectomy in their assessments that plaintiff was capable of performing light to medium work. (Doc. 8, pp. 376, 2112, 2144)

The plaintiff testified at the hearing that the hysterectomy "messed up [her] bladder," that the hysterectomy caused "[m]ost of [her] problem[s]," including the collapse of her stomach. (Doc. 8, pp. 48, 54, 56) Plaintiff did not testify as to any medical problems attributable to the oophorectomy.

As shown above, substantial evidence on the record supports the conclusion that plaintiff's hysterectomy and oophorectomy did not preclude her from performing light work.

### (6) Chronic Shoulder Strain

Plaintiff's military medical records show that she presented numerous times for shoulder pain during the period January 2006 through April 2007. (Doc. 8, pp. 745, 784, 790, 816, 844, 847, 852, 863, 868, 871, 874, 877, 880) However, Dr. Harry Creekmore, M.D., a civilian physician who treated plaintiff from December 2007 through May 2008 while she was on active duty, performed bilateral breast reduction surgery in February 2008 to relieve her chronic neck, shoulder and back pain. (Doc. 8, p. 346) Dr. Creekmore noted on May 14, 2008 that plaintiff "states that her back and

shoulder pain are relieved . . . [s]he is completely healed . . . ." (Doc. 8, p. 344) X-rays taken at Ft. Bragg in January 2009 showed that plaintiff's shoulders were normal. (Doc. 8, pp. 1413) Apart from the 2009 x-rays, there are no shoulder-related entries in plaintiff's military medical records after her bilateral breast reduction surgery.

The VA awarded plaintiff 20 percent disability for chronic left shoulder strain, noting that her "service treatment records show[ed] no clear evidence of continued treatment or a chronic disability with [her] shoulder," and that "X-ray findings were within normal limits." (Doc. 8, p. 203) The VA concluded that a higher award was not warranted because the evidence did not show any "additional significant orthopedic disability manifested by limitation, or restriction of activity, or functional impairment . . . ." (Doc. 8, p. 203)

The VA awarded plaintiff 10 percent disability for chronic right shoulder strain, noting that her service treatment records "show no clear evidence of continued treatment or a chronic disability with [her left] shoulder," and that "X-ray findings were within normal limits." The VA again concluded that a higher award was not warranted because the evidence did not show any "additional significant orthopedic disability manifested by limitation, or restriction of activity, or functional impairment . . . ." (Doc. 8, p. 212)

The VA medical records do not reflect that plaintiff sought treatment for either shoulder subsequent to her discharge from the Army.

Drs. Kumar, Robinson, and Ryan considered plaintiff's chronic shoulder strain in their assessments that plaintiff was capable of performing light to medium work. (Doc. 8, pp. 376, 2112, 2144)

Plaintiff testified at the hearing that she had a bilateral breast reduction in an effort to resolve neck and shoulder pain, but that the surgery had not helped. (Doc. 8, pp. 70-71)

29

As shown above, substantial evidence on the record supports the conclusion that plaintiff's chronic shoulder strain did not preclude her from performing light work.

### (7)  Chronic Back Pain

Plaintiff's military medical records show that she presented for cervical spine (neck) pain numerous times from November 2006 through October 2008.  (Doc. 8, pp. 436, 439, 441, 528, 537, 596, 609, 615, 628, 646, 694, 753, 784)  There also were numerous instances from August 2005 through September 2008 when she denied any neck pain.  (Doc. 8, pp. 306, 470, 746, 784, 790, 816, 844, 847, 852, 863, 868, 871, 877, 880, 897)

An x-ray in April 2007 revealed "[m]ild reversal of the usual lordosis,"[15] otherwise it was an unremarkable examination.  (Doc. 8, p. 717)  An MRI of the cervical spine in October 2007 revealed a "[q]uestionable abnormality in the cervical cord at the C4 level . . . [t]he cord is otherwise normal . . . [t]here is mild cervical kyphosis[16] . . . [but] the cord is  otherwise normal . . . there is [n]o cervical disc disease . . . [t]here is no disc bulge or disc herniation at any cervical level" . . . [t]here is no facet or uncovertebral joint disease . . . [t]he foramen [17] are open . . . [t]he exiting nerve roots are intact . . . [t]here is no stenosis or neural compression . . . [although] there is a minor disc bulge at T3-4 without significant mass effect."  (Doc. 8, p. 458)  A CT scan of the cervical spine in November 2007 noted "no discrete . . . abnormality involving the spinal cord . . . including the C4 level . . . [t]he remainder of the bones and disc spaces, as well as the neural foramina, appear unchanged as compared with the previous study . . . [m]ild degenerative changes throughout the cervical spine . . . noted."  (Doc. 8, p. 1418)  X-rays of the cervical spine in September 2008 were

---

[15]  Lordosis . . . "concave portion of the vertebral column as seen from the side." *Dorland's* at p. 1074.

[16]  Kyphosis – "an area of the vertebral column that is convex . . . as viewed from the side." *Dorland's* at p. 992.

[17]  Foramen – "a natural opening or passage, especially one into or through a bone." *Dorland's* at p. 729.

"UNREMARKABLE," showing "cervical spine anatomic alignment with preservation of vertebral body and dis space height throughout . . . [n]o significant neural foraminal narrowing . . . present . . . (Doc. 8, pp. 1415, 1530)  A CT scan in February 2009 revealed "[m]inimal bilateral sacroiliac osteoarthritis."  (Doc. 8, p. 1412)

Plaintiff's military medical records do not show that she ever presented for pain of the thoracic spine.  Reference to plaintiff's thoracic spine is swept up in references to her cervical spine (neck) and her lumbar spine (lower back).  Although the objective medical evidence pertaining to plaintiff's thoracic spine is minimal, X-rays in January 2009 showed that plaintiff's thoracic spine was normal (Doc. 8, p. 1413), and x-rays in March 2009 revealed only "vertebral osteophytes,"[18] *i.e.*, "EVIDENCE OF THORACIC SPINE DEGENERATIVE DISEASE" (Doc. 8, p. 1408).

References to plaintiff's lumbar spine are plentiful in the documentation pertaining to her several MEB/PEBs.  As far as presenting for treatment for lumbar spine pain, plaintiff's military medical records show that she presented twice for obesity-related lower back pain in 2005, and for lower back pain as a stand-alone symptom once in October 2008.  (Doc. 8, pp. 308, 311, 436)  The only objective medical evidence pertaining to plaintiff's lumbar spine are x-rays in September 2008 of plaintiff's lumbar spine which were unremarkable, showing "anatomic alignment with preservation of vertebral body height throughout . . . [n]o pars[19] defects . . . identified . . . spondylolisthesis[20] . . . [sacroiliac] joints are symmetric."  (Doc. 8, pp. 1414-15)

The VA awarded plaintiff 10 percent disability for "chronic cervical spine strain."  (Doc. 8, p. 208)  The VA noted that x-rays were "within normal limits."  (Doc. 8, p. 208)  A higher

---

[18]  Osteophytes – "a bony excrescence or [bony] outgrowth."  *Dorland's* at p. 1348.

[19]  Pars – "a particular division or portion of a larger area . . . ."  *Dorland's* at p. 1348.

[20]  Spondylolisthesis – "forward displacement . . . of one vertebra over another . . . ."  *Dorland's* at p. 1754.

percentage was not awarded because "[t]he medical evidence d[id] not show that there is additional significant orthopedic disability manifested by limitation of motion, or restriction of activity, of functional impairment . . . caused by pain during periods of flare-up, or when the body part is used repeatedly over a period of time." (Doc. 8, p. 209)

The VA did not award disability for plaintiff's thoracic claims, nor did it even address the issue. The VA did, however, award plaintiff 10 percent disability for lumbar degenerative arthritis, noting in the same breath that her "treatment records show no evidence of treatment or a diagnosed lower back disability . . . ." (Doc. 8, p. 206) Inspection of the spine was normal, although x-rays showed "mild disc disease at L1 through L5." (Doc. 8, p. 207) A higher percentage was not awarded because "[t]he medical evidence d[id] not show that there is additional significant orthopedic disability manifested by limitation of motion, or restriction of activity, of functional impairment . . . caused by pain during periods of flare-up, or when the body part is used repeatedly over a period of time." (Doc. 8, p. 207)

There is no evidence in plaintiff's post-discharge VA medical records that she sought medical care for back pain.

Drs. Kumar, Robinson, and Ryan considered plaintiff's chronic back pain in their assessments that plaintiff was capable of performing light to medium work. (Doc. 8, pp. 376, 2112, 2144) As previously noted at pp. 28-29, Dr. Creekmore wrote in May 2008 that plaintiff "state[ed] that her back and shoulder pain [we]re relieved . . . [s]he is completely healed . . . ." (Doc. 8, p. 344)

Plaintiff testified at the hearing that she began experiencing pain in 2003 after receiving a nerve block for surgery, and described her pain as being in her lower back.[21] (Doc. 8, p. 52)

_____

[21] Plaintiff also testified at the hearing that she had 3 broken ribs. (Doc. 8, p. 62) To the extent that plaintiff's ribs are tangentially related to her back, the medical evidence of record pertaining to her ribs is as follows: X-rays in January 2009 suggested "minimally displaced fracture of at least the anterolateral aspect of the left 8th rib and possibly the 7th and 9th ribs . . . ." (Doc. 8, p. 1414) Examination in February 2009 revealed "NO PAIN OVER RIBS." (Doc.

Although the ALJ determined that chronic back pain constituted a severe impairment, substantial evidence on the record supports the conclusion that chronic back pain did not preclude plaintiff from performing light work.

### (8) Chronic Knee Pain

Plaintiff's military medical treatment records show that she sought medical attention for her right knee as early as 2004, and that she complained frequently about pain in her right knee. (Doc. 8, p. 787) X-rays of the right knee in June 2006 revealed "[m]ild degenerative spurring of the tibial spines . . . possible capsule effusion."[22] (Doc. 8, p. 773) A January 2007 MRI of the right knee revealed "[m]edial meniscus body and posterior horn tear with mild medial extrusion of the meniscal body . . . [m]edial compartment osteoarthritis with associated cartilaginous thinning . . . [s]mall loculated fluid collection with signal abnormality suggestive of ganglion cyst with internal debris or loculated effusion with small loose body." (Doc. 8, p. 694)

X-rays in October 2007 revealed "[m]inimal osteoarthritis of the right knee . . .[s]uspicious for chondromalacia[23] of the right patella." (Doc. 8, p. 637) An MRI of plaintiff's right knee in October 2007 revealed "[p]ost surgical changes in the medial meniscus with possible recurrent tear in the posterior horn . . . [p]atellofemoral chondromalacia moderate in severity . . . [j]oint effusion . . . [a]nterior soft tissue scarring" (Doc. 8, p. 459) The record shows that plaintiff had a "partial medial meniscectomy and . . . chondroplasty of the patella" in early 2007, although the exact date of the surgery is not apparent in the record. (Doc. 8, p. 413) A February 2009 examination of the musculoskeletal system showed balance, gait and stance normal. (Doc. 8, p. 2423) March 2009 x-

---

8, p. 403) A full body bone scan in February 2009 revealed no "active rib fractures." (Doc. 8, p. 394) X-rays in March 2009 revealed normal ribs. (Doc. 8, pp. 1409-10)

[22] Effusion – "the escape of fluid into a part or tissue . . . ." *Dorland's* at p. 595.

[23] Chondromalacia – "softening of the articular cartilage, most frequently in the patella." *Dorland's* at p. 352.

rays revealed "EVIDENCE OF RIGHT KNEE DEGENERATIVE DISEASE." (Doc. 8, p. 1408)

October 2007 x-rays of plaintiff's left knee revealed "[n]o acute/chronic osseous abnormality." (Doc. 8, p. 634) An October 2007 MRI of plaintiff's left knee showed slight "signal changes in the posterior horn of the medial meniscus [possibly] represent[ing] a minimal shallow under surface tear . . . [with] no other intra-articular injuries . . . seen . . . [m]oderately severe patellofemoral chondromalacia . . . [and] joint effusion." (Doc. 8, p. 488) March 2009 x-rays revealed a "normal" left knee. (Doc. 8, p. 1408)

The VA awarded plaintiff 10 percent disability for chronic strain of the right knee noting in relevant part that, although some issues with her right knee were apparent during her pre-discharge VA physical, the range of motion of her right knee was "within normal limits," she had only "slight instability" in the right knee, and "[t]he medical evidence does not show that there is additional significant orthopedic disability manifested by limitation of motion, or restriction of activity, or functional impairment . . . caused by pain during periods of flare-up, or when the body part is used repeatedly over time." (Doc. 8, p. 208) The VA also noted that plaintiff only had "slight instability" due to a cruciate ligament injury . . . ." (Doc. 8, p. 210)

The VA awarded plaintiff 10 percent disability for "chronic strain" of the left knee noting again in relevant part that, although some issues were apparent with her left knee during her pre-discharge VA physical, the range of motion of her left knee was within normal limits, the left knee exhibited no instability, and "[t]he medical evidence does not show that there is additional significant orthopedic disability manifested by limitation of motion, or restriction of activity, or functional impairment . . . caused by pain during periods of flare-up, or when the body part is used repeatedly over time." (Doc. 8, pp. 209-10)

A post-discharge MRI of right knee by VA in September 2009 revealed "[s]mall joint

effusion, very minimal fluid in the posterior knee soft tissue, early chondromalacia patella and a tear of the posterior horn of the medial meniscus . . . ," otherwise the MRI was normal.  (Doc. 8, p. 2177) A post-discharge MRI of plaintiff's left knee also conducted in September 2009 revealed "[s]mall joint effusion and possible small tear of the posterior horn of the medial meniscus," otherwise the MRI was once again normal.  (Doc. 8, p. 2176)

Bilateral knee x-rays taken by the VA in October 2009 were "normal."  (Doc. 8, p. 2175) The related orthopedic consult notes reflect that plaintiff's right knee had "full range of motion and full flexion . . . good quadriceps function . . . [n]o ligamentous weakness" and the examination was "within normal limits." (Doc. 8, p. 2202)  The related orthopedic consult notes also reflect that the earlier MRIs were "nonconclusive for any major meniscal problems," and although an MRI of the left knee suggested a "questionable extension of a tear in the posterior horn of the medial meniscus," the physician "did not see this clearly."  (Doc. 8, p. 2202)  The orthopedic consult concluded noting that all knee-related physical tests were normal, the cause of plaintiff's pain was "undetermined," and that nothing in the MRIs or x-rays supported her claim of bilateral knee pain.  (Doc. 8, p. 2202) Finally, a VA medical report written in June 2010 noted the following with respect to plaintiff's knees: "no tenderness, no swelling in any joints, rom decreased in rt knee, mild medial meniscal tenderness but McMurray's and lachmans neg."  (Doc. 8, p. 2297)

Drs. Kumar, Robinson, and Ryan considered plaintiff's knee pain in their assessments that plaintiff was capable of performing light to medium work.  (Doc. 8, pp. 376, 2112, 2144)

Plaintiff testified at the hearing only that she had surgery on her right knee, that her right knee had gotten worse after the surgery, and that she "chose not to have surgery" on her left knee because of her post-surgical experience with her right knee.   (Doc. 8, p. 53)

Although the ALJ determined that chronic knee pain constituted a severe impairment,

substantial evidence on the record supports the conclusion that chronic knee pain did not preclude plaintiff from performing light work.

### (9) Allergies

Plaintiff's military medical records show that plaintiff did not have allergies from July 2005 through September 2008. (Doc. 8, pp. 299, 1279, 1653) Those records specifically note that "ALL AEROALLERGEN SKIN TESTING WAS NEGATIVE" in October 2007; however, plaintiff was diagnosed with Rhinitis Vasomotor.[24] (Doc. 8, pp. 699-700)

The VA's pre-discharge examination revealed that plaintiff's allergy claim was "noncompensable" because she did not have "a greater than 50 percent obstruction of nasal passage[s] on both sides or complete obstruction on one side." (Doc. 8, p. 215) The VA's post-discharge medical records repeatedly reflected "NKA," *i.e.*, no known allergies. (Doc. 8, pp. 2178, 2219, 3335, 2230)

Drs. Kumar, Robinson, and Ryan considered plaintiff's allergies in their assessments that plaintiff was capable of performing light to medium work. (Doc. 8, pp. 376, 2112, 2144)

Plaintiff testified at the hearing that, although people with allergies "sneeze and cough," she got "short of breath," her "problem" being that she was unable to "get . . . enough air in [her] nose." (Doc. 8, p. 54)

As shown above, substantial evidence on the record supports the conclusion that allergies did not preclude plaintiff from performing light work.

### (10) Neuropathy

Although not entirely clear, this ground for relief appears to encompass two types of

---

[24] Rhinitis – "inflammation of the mucous membrane of the nose." *Dorland's* at p. 1639. Vasomotor – "a form of hypertrophic rhinitis with symptoms similar to those of allergic rhinitis . . . or nonallergic rhinitis not caused by an infectious agent." *Dorland's* at p. 1639.

neuropathy, peripheral neuropathy[25] and autonomic neuropathy. Plaintiff's military records do not show that she ever was diagnosed or treated for either. On the contrary, the only references in plaintiff's military medical records to neuropathy is that she did not have neuropathy. (Doc. 8, pp. 436, 534, 537, 931)

The VA examiner "noted" during plaintiff's pre-discharge examination that she had peripheral "neuropathy in the lower extremities which resulted in neuralgia," and "autonomic neuropathy of [her] abdomen." (Doc. 8, p. 202) However, the examiner determined that both were "noncompensible" because, although plaintiff exhibited peripheral neuropathy, her "sensory function was within limits," and her autonomic neuropathy was "not shown to cause any functional impairment . . . ." (Doc. 8, p. 202)

Although there are several references in plaintiff's post-discharge VA medical treatment records pertaining to prescriptions for "neuropathy," there are no actual treatment records pertaining to that condition.

Drs. Kumar, Robinson, and Ryan considered plaintiff's neuropathy in their assessments that plaintiff was capable of performing light to medium work. (Doc. 8, pp. 376, 2112, 2144)

Plaintiff testified at the hearing as follows with respect to her neuropathy: "It is the numbness of my arms . . . . It's constantly I'm like, scared . . . [n]ervous, sad . . . [v]ery depressed . . I['m] constantly dizzy . . . [when I] swallow [it] hurts." (Doc. 8, p. 50)

As shown above, substantial evidence on the record supports the conclusion that allergies did not preclude plaintiff from performing light work.

---

[25] Peripheral neuropathy – "nerve damage, often caus[ing] weakness, numbness and pain, usually in [the] hands and feet . . . ." http://ww.mayoclinic.org/diseases-conditions/peripheral-neuropathy/basics/definition/con-20019948.

## (11) Asthma

Plaintiff's military medical records suggest an asthma onset date of 1994. (Doc. 8, p. 2376) Plaintiff's asthma was most often described over the years that followed as mild, intermittent, stable, or controlled. Records from September 2005 through September 2008 specifically characterize plaintiff's condition as "exercise induced asthma." (Doc. 8, pp. 310, 538) Numerous records from October 2008 through March 2009 reflect no asthma at all. (Doc. 8, pp. 385, 398, 403, 408, 992, 1029)

Objective medical evidence in plaintiff's military medical records include a radiologic examination report in August 2004 that revealed "no acute or active . . . pulmonary disease," and a pulmonary function examination in February 2005 to evaluate plaintiff for asthma revealed only a "mild" obstructive defect, but was otherwise negative for asthma. (Doc. 8, pp. 298, 337) A medical record dated October 31, 2008 reported: "Although she carries [a] diagnosis of Asthma, her Methacholine[26] challenge test was normal" (Doc. 8, p. 981) Cardiopulmonary Exercise Testing (CPEX) and Laryngoscopy performed in November 2008 found no "objective evidence to support the diagnosis of asthma, and that plaintiff's shortness of breath was "due mainly to over weight and deconditioned status . . . ." (Doc. 8, p. 417) Plaintiff's lungs were found to be normal during a February 2009 examination. (Doc. 8, p. 2423)

The VA did not assign a disability rating for asthma, because the "examiner did not clearly state which of the PFT findings best described" her asthma. (Doc. 8, p. 220) The VA noted that it "deferred a decision on service connection pending clarification from the examiner." (Doc. 8, p. 220) Plaintiff has not filed any documents to show her asthma claim with the VA has been resolved.

---

[26] Methacholine – a drug "used in bronchial challenge testing" for the diagnosis of asthma. *Dorland's* at p 1146.

X-rays made by the VA on July 2009 following plaintiff's discharge showed that plaintiff's "lungs [we]re clear" and the exam "NORMAL." (Doc. 8, p. 2438) The VA also described plaintiff's asthma as "stable on Albuterol" in July and December 2009, March 2010. (Doc. 8, pp. 2203, 2255, 2304, 2327) Plaintiff denied shortness of breath to the VA in June 2010 following her discharge. (Doc. 8, p. 2290)

Drs. Kumar, Robinson, and Ryan considered plaintiff's asthma in their assessments that plaintiff was capable of performing light to medium work. (Doc. 8, pp. 376, 2112, 2144)

Plaintiff testified about her asthma at the hearing as follows:

> It started in '96 when I went through . . . training. I don't know what happened but . . . they told me I ha[d] asthma. . . I just get short of breath by talking, but whatever move I do I get short of breath . . . just by walking, talking, any move that I do I get short of breath. I always believe that it's not asthma, but they say that it is asthma . . . It's got to be something else like obstruction . . . [o]n my [esophagus] . . . [T]hey say I have refl[u]x . . . I can breath through my mouth but my problem is through my nose . . . I don't get . . . enough air in my nose. . . . I know people sneeze and cough but in my case I get short of breath.

(Doc. 8, p. 54)

As shown above, substantial evidence on the record to support the conclusion that asthma did not preclude plaintiff from performing light work.

### (12) The ALJ's RFC Determination
### at Step Four

Although the ALJ did not make exhibit-by-exhibit reference to the medical record in his analysis at step four, a plain reading of the ALJ's narrative shows that he considered the entire medical evidence of record in determining that plaintiff had the RFC to perform the full range of light work. As shown in ¶¶ (1)-(11) above, the ALJ's RFC determination was supported by substantial evidence. Comparing the medical evidence of record with plaintiff's testimony at the

hearing also justified the ALJ's conclusion that plaintiff's "statements concerning the intensity, persistence and limiting effects of those [severe impairments] [we]re not credible to the extent they [we]re inconsistent with" his RFC assessment. (Doc. 8, p. 28) Plaintiff's admission that, at the time of her discharge just ten months prior to the hearing, she was "working in different offices, like administrative offices . . . [the] mail room . . . [and] processing soldiers" was confirmation that she was capable of performing <u>at least</u> light work. (Doc. 8, pp. 44-45)

As explained above, the ALJ did not err in his RFC determination at step four. The only remaining question is whether the ALJ erred at step five.

### b. Step Five Analysis

The fifth step involves using the RFC determination from step four, as well as a consideration of the claimant's age, education, and work experience, to determine if the claimant "can make an adjustment to other work" available in significant numbers in the economy. 20 §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1560(c). The record shows that the ALJ considered plaintiff's age, education, and work experience in his determination at step five. (Doc. 8, pp. 32-33) The ALJ also relied on the testimony of the VE at the hearing in determining that there was light work in the local and national economy that plaintiff could perform. (Doc. 8, ¶ 10, pp. 32-33) The record shows that the VE's testimony at the hearing was based on hypotheticals that properly reflected plaintiff's RFC.

As explained above, the ALJ did not err at step five. Consequently, the second claim of error is without merit.

### IV.  RECOMMENDATION

The undersigned **RECOMMENDS** that the Commissioner's decision be **AFFIRMED** for the reasons explained above.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 26th day of March, 2014.

/s/Joe B. Brown_____
Joe B. Brown
United States Magistrate Judge